# United States District Court

## SOUTHERN DISTRICT OF INDIANA

UNITED STATES OF AMERICA

V.

BENJAMIN ERNEST BULRISS

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:17-mj-01119

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On or about November 25, 2017, through and including December 18, 2017, in the Southern District of Indiana, BENJAMIN ERNEST BULRISS, defendant herein, devised a scheme to obtain money ($15,000) from VICTIM 1 by false and fraudulent pretenses, specifically false representations about the existence of compromising photographs of VICTIM 1 which were communicated to VICTIM 1. In furtherance of said scheme, on or about November 25, 2017, the defendant caused an interstate signal to travel from outside the state of Indiana to Indiana.

All in violation of Title 18, United States Code, Section 1343.

I further state that I am a Special Agent, and that this complaint is based on the following facts:

See attached Affidavit.

**Continued on the attached sheet and made a part hereof.**

Special Agent Steven Secor, FBI

**Sworn to before me, and subscribed in my presence**

December 19, 2017                at   Indianapolis, Indiana
**Date**

Debra McVicker Lynch, U.S. Magistrate Judge
**Name and Title of Judicial Officer**                **Signature of Judicial Officer**

# AFFIDAVIT

I, STEVEN T. SECOR ["AFFIANT"], being duly sworn according to law, depose and state as follows:

1. I am and have been employed as a Special Agent with the Federal Bureau of Investigation ["FBI"] since September of 2003. Prior to that time, I spent 17 weeks training to be a Special Agent at the FBI Academy in Quantico, Virginia beginning on June 1, 2003. Through the FBI, I have received extensive training related to the investigation of federal crime to include bank robberies, violent crimes, and extortion attempts. I am currently assigned to the FBI Safe Violent Crime Task Force ["VCTF"] in the Indianapolis Field Office of the FBI. In this assignment, I investigate all manner of violent crime, to include bank robberies, firearms offenses, and extortion attempts.

2. This affidavit is submitted in support of an application for a Warrant for Arrest of BENJAMIN ERNEST BULRISS ["BULRISS"], white male, date of birth XX/XX/1988 and Social Security Account Number XXX-XX-8271. BULRISS is currently in the custody of the Marion County (Indiana) Jail following a probable cause arrest by your AFFIANT on December 18, 2017. Based on my training and experience, and based on the facts below, I believe that BULRISS committed wire fraud as part of an extortion attempt against a local Indianapolis business owner. This wire fraud is alleged to be in violation of Title 18 United States Code, Section 1343.

3. The statements contained in this affidavit are based in part on information provided by, and conversations held with, Special Agents of the FBI; Task Force Officers ["TFOs"] assigned to the Indianapolis VCTF; detectives and patrol officers of the Indianapolis

Metropolitan Police Department ["IMPD"]; witnesses; and on your AFFIANT's experience and background as a Special Agent of the FBI.

4. Your AFFIANT has not included each and every fact that has been revealed through the course of this investigation. Your AFFIANT has set forth only the facts that are believed to be necessary to establish the required foundation for this issuance of the requested Warrant for Arrest.

## BACKGROUND OF THE INVESTIGATION

5. On Monday December 18, 2017, VCTF TFO Don Whitehead ["TFO WHITEHEAD"] was contacted by the Howard County (Indiana) elected prosecutor. The prosecutor's brother-in-law ["VICTIM"] had received, on the windshield of his car, an extortion demand note. The note was found by a family member of the victim on the morning of December 18, 2017. The demand note was typewritten with additional instructions handwritten. The note was two pages long. The greeting at the top of the letter included the VICTIM's first and last name.

6. The letter writer alleged to have proof, in the form of pictures, of VICTIM's marital infidelity. The letter writer also alleged to have proof of VICTIM's professional malfeasance while operating his business. The letter writer demanded $15,000.00 in order to keep both the personal and professional evidence from being delivered to family and law enforcement. The letter writer also stated that the VICTIM had twenty-four (24) hours to comply with the demand. If the victim agreed to the demand, the VICTIM was to tweet a specified message through his company's official Twitter account. The VICTIM was then to text "Yes" to a phone number specified in the extortion demand note indicating VICTIM's agreement to pay the extortion demand. The VICTIM was then to purchase a specified leather

backpack from the Tumi store at the Fashion Mall, place the $15,000.00 in unmarked bills into the backpack, text the same specified number that the money was ready. The VICTIM was then to await further instructions as to a drop location for the extortion money.

7. VICTIM was out of town, but contacted the Howard County Prosecutor to look into the matter. The investigation was then referred to the FBI.

8. Approximately two days prior to the extortion demand, a vehicle owned by the VICTIM was stolen from his house. The vehicle was a silver 2013 4-door Jeep Wrangler. The VICTIM reported to the vehicle stolen to IMPD.

9. The FBI contacted the victim and instructed him to tweet the message as dictated in the letter. The FBI then made contact with the letter writer, while purporting to be the VICTIM, using a cell phone acquired specifically for this investigation. The letter writer responded by text that the money was to be dropped behind the Vitamin Shoppe store, adjacent to the Chick-Fil-A, on East 82nd Street in Indianapolis, Indiana. An Internet search by your AFFIANT revealed a Vitamin Shoppe located at 3730 East 82nd Street, Indianapolis, Indiana. The location was indeed adjacent to a Chick-Fil-A restaurant.

10. Further text contact was made between the FBI, posing as the VICTIM, and the letter writer. The letter writer stated via text the following instructions:

> "Place behind the vitamin shop
>
> just on ground I'm on phone
>
> with who can see it and
>
> then will text u right where
>
> car is it's practically in sight

Onf it I will tell you exactly where. "

11.     Through previous texts between the VICTIM and the letter writer, it was determined that the car to which the letter writer was referring was the stolen Jeep Wrangler. It was also conveyed that the evidence of the VICTIM's personal and professional wrong-doing would be in the Jeep.

12.     The FBI purchased the Tumi backpack as specified by the letter writer. The bag was a TUMI T-Pass Business Class Leather Brief Pack. Then total purchase price was approximately $725.00. The backpack was loaded by the FBI with a box containing a magazine and a $1.00 bill. The box was taped shut. The backpack was then placed in a TUMI gift box and TUMI bag.

13.     An undercover FBI Agent, posing as the VICTIM, then proceeded to the drop location. Several unmarked FBI cars and Agents were stationed around the drop location. As the Agent was walking up to the drop location behind the Vitamin Shoppe, he texted the letter writer letting him know the drop was imminent. The letter writer then responded "It's in front row of main event down the street." The FBI believed the letter writer was referring to the location of the stolen Jeep.

14.     The drop was made by the undercover Agent who then departed the area. Moments later, surveillance Agents noticed a late model Chevrolet Cruze bearing Indianapolis Colts plate FD7819 circling the vicinity of the dropped TUMI bag. Moments later, the Cruze stopped behind the Vitamin Shoppe and a white male exited, picked up the TUMI bag, and placed it in the back seat of the Cruze. The white male appeared to be the only occupant of the

Cruze. Surveillance Agents moved in and placed the driver under arrest before his could re-enter the Cruze and depart. The driver was identified as BULRISS.

15.     BULRISS was transported to the FBI Field Office in the Castleton area of Indianapolis. BULRISS was advised of his Miranda rights, and agreed to be interviewed without a lawyer present. BULRISS agreed to the interview after signing an FBI Advice of Rights form. The interview was conducted by your AFFIANT and TFO WHITEHEAD and was video recorded.

16.     BULRISS told your AFFIANT and TFO WHITEHEAD that he was previously employed in the accounting department of VICTIM's company for three months, from August to October of 2017. BULRISS's employment ended when an anticipated permanent position did not open up. BULRISS holds both a bachelor's degree and an MBA from Indiana University in Bloomington, Indiana.

17.     During his brief tenure, BULRISS uncovered what he believed to be evidence of insurance fraud committed by the VICTIM, relating to a fire at one of VICTIM's facilities years prior. Your Affiant has no reason to believe VICTIM actually committed insurance fraud. BULRISS decided to use the information he believed he uncovered to extort $15,000.00 from VICTIM. BULRISS indicated that he needed the money, as he had amassed approximately that much in credit card debt, and was currently unemployed.

18.     BULRISS typed the extortion letter on a common area computer at his apartment complex, which was located behind and adjacent to the Vitamin Shoppe where the drop was made. BULRISS admitted that the handwriting added to the typed letter was his.

19.     BULRISS indicated that he travelled to the VICTIM's house on North Pennsylvania Street a couple of nights before his arrest. The trip was made in BULRISS's

Chevy Cruze. BULRISS had with him the extortion letter, which he originally intended to leave on one of the VICTIM's cars. BULRISS saw the Jeep in VICTIM's driveway and found it unlocked with the keys in the center console. Rather than leaving the letter that night, BULRISS instead took the Jeep and parked it a few blocks over. BULRISS then returned to the house on foot, retrieved his car, and returned home. At approximately 1:00 a.m. on December 18, 2017, BULRISS took an Uber back to the VICTIM's house, placed the extortion letter on the windshield of the VICTIM's other car, and drove the Jeep back to his apartment.

20. BULRISS admitted to texting with the person he believed to be the VICTIM about where and how to drop the extortion money in the backpack. BULRISS utilized his cell phone, an Apple iPhone 7, to facilitate this communication. Your AFFIANT noted that the cell phone number given by BULRISS as part of the interview had a 317 area code and the number communicating with the undercover FBI Agent had an 812 area code. BULRISS stated he was able to disguise his actual number by using an App called "Burner" which he had downloaded to his phone. The App was downloaded from the App Store maintained by Apple. BULRISS's service provider for his cell phone was Verizon

21. Your AFFIANT subsequently researched the Burner App and learned it was produced and maintained by a company based in Los Angeles, California. Your AFFIANT also knows through training and experience that Apps available for download through Apple are maintained on Apple servers outside of the state of Indiana. As such, interstate signals were utilized to download and use the Burner application, which was in turn used to facilitate the scheme to defraud. The application was downloaded on or about November 25, 2017.

22. After his arrest, the stolen Jeep was located as described by BULRISS in his text messages with the undercover FBI Agent. The backseat of the Jeep held a briefcase, which

contained the documents that BULRISS believed were proof that the VICTIM committed insurance fraud. When asked during the interview about any pictures purporting to show the VICTIM engaged in martial infidelity, BULRISS admitted that claim was "bullshit" and he had no such pictures in his possession. BULRISS admitted this was a lie when he wrote that claim in the extortion letter and conveyed in the texts that those pictures were in the Jeep.

23. Based on the above information, your Affiant has probable cause to believe that BULRISS violated Title 18 USC, Section 1343 in that he transmitted via his Apple iPhone 7 with service provided by Verizon Wireless the fraudulent claim that he had compromising photos of the VICTIM and that these fraudulent claims were made in furtherance of his scheme to extort $15,000.00 from the VICTIM. Your AFFIANT also alleges that BULRISS downloaded the Burner App via Apple servers outside the state of Indiana to help facilitate his fraudulent claim of having compromising photographs of the victim in furtherance of his extortion scheme.

FURTHER YOUR AFFIANT SAITH NOT.

Special Agent Steven T. Secor
Federal Bureau of Investigation

Subscribed and sworn before me the 19th day of December, 2017.

Hon. Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana